IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

E2INTERACTIVE, INC. and
INTERACTIVE COMMUNICATIONS
INTERNATIONAL, INC.,

                    Plaintiffs,                       OPINION and ORDER

    v.                                         09-cv-629-slc

BLACKHAWK NETWORK, INC.,

                    Defendant.

---

Plaintiffs e2Interactice, Inc. and Interactive Communications International, Inc. filed the current patent infringement suit against defendant Blackhawk Network, Inc. on October 14, 2009, alleging that defendant Blackhawk Network Inc. is infringing plaintiffs' United States Patent No. 7,578,439 ('439 patent) by operating a Gift Card Mall.[1]

Before the court is defendant's motion to disqualify plaintiffs' counsel, Alston & Bird, LLP (*see* dkt. 14) and a related motion to strike new evidence and arguments found in defendant's reply brief (*see* dkt. 51).  For the reasons that follow, I am denying the motion to disqualify.  (For what it's worth, I am granting the motion to strike except with respect to new evidence about defendant's retention of Pillsbury).

Starting with the motion to strike, plaintiff's motion challenges defendant's attempt in its reply to file supplemental affidavits and to add new arguments relying on those affidavits.  Dkt. 51.  This is improper.  A reply brief is an opportunity to address arguments raised in the opposing party's response, not a chance to introduce new lines of arguments or facts that a movant failed to introduce earlier.  A moving party is expected to come with its game when it files its motion,

---

[1] The '439 patent is referred to as "plaintiffs' patent" for the sake of simplicity. E2Interactive is the asignee of the '439 patent and Interactive Communications is the exclusive licensee, but their roles are not relevant to the issues currently before the court.

addressing completely each issue that must be addressed to obtain the relief it seeks.  In this case, that required defendant to explain exactly how defendant is or was a client of Alston's and why this relationship creates a conflict of interest.

Defendant's supplemental affidavits are aimed at patching holes left in its original showing, including proving that matters were "substantially related," dkt. 40; detailing a meeting between defendant and Alston, dkts. 41, 42, 43, 45; and bolstering an earlier declaration with documentary evidence, dkt. 45.  The only new evidence that is truly responsive to plaintiffs' opposition is the evidence related to defendant's hiring of Pillsbury, dkts. 43 and 45.  As it turns out, the evidence is not too helpful (it does not put in dispute the fact that matters–that defendant did retain Pillsbury), but it should be allowed nonetheless.  Therefore, I am denying the motion to strike with respect to the new evidence related to defendant's retention of Pillsbury but granting it in all other respects.

As for defendant's motion to disqualify, it is grounded on the notion a lawyer should not be allowed to represent a client when a conflict of interest exists.  Although defendant contends that such a conflict exists, either because Alston agreed not to sue defendant, or because defendant was or is a client, or had a protected non-client relationship with Alston, the evidence does not sufficiently support any of these contentions.

From the parties' submissions and the record, I find the following facts for the purpose of deciding the present motion:

FACTS

**I. Alston & Bird's Representation of Safeway, Inc.**

Defendant Blackhawk Network, Inc. is a subsidiary of Safeway Inc..[2]  In 2007, Paul Ware and Financial Systems Innovation, LLC brought a patent infringement lawsuit against Safeway and other companies entitled *Ware v. Avis Budget Car Rental, LLC et al.*, No. 4:2009-cv-00189 (N.D. Ga.) (formerly No. 07-cv-01590 (N.D. Tex.)) (the *Ware* litigation).  In September 2007, Safeway retained William Baker of Alston & Bird to represent Safeway in the *Ware* litigation.  Ann Erickson, senior corporate counsel for Safeway, refused to sign Alston's initial proposed retainer agreement and specifically objected to an advance waiver of conflicts provision and a "one client" provision limiting Alston's representation to the Safeway parent entity and not its subsidiaries.  The first provision, entitled "Waiver of Future Conflicts," stated that Safeway waived any future conflicts so long as the subject matter was not substantially related to Alston's work for Safeway.  The second provision, entitled "Limitation of Client Relationship to One Entity, Not Affiliates," provided that Alston's "representation of Safeway, Inc., does not give rise to an attorney-client relationship between the Firm and . . . any . . . subsidiary or affiliated entity . . .."

Erickson told Baker that "Safeway would not agree to . . . any term that would allow Alston to sue its significant subsidiaries," including defendant, and that "by representing Safeway, Alston was also representing" its subsidiaries.  Erickson struck the two provisions from the agreement, executed the agreement as amended and mailed it to Baker in October 2007.  Baker accepted the changes.  The engagement letter states that Alston represents Safeway.

During summer 2009, Alston worked on a motion to transfer the *Ware* litigation from the Northern District of Texas to the Northern District of Georgia.  In preparing this motion, Alston

---

[2]  Defendant is wholly owned by Blackhawk Network Holdings, which in turn is 95% owned by Safeway.

3

received confidential information from defendant related to defendant's sales and business relationships in Georgia. The information included the identity of defendant's vendors, invoices, the identity of retail outlets that sold defendant's products (gift cards), and defendant's sales information for Georgia.

In summer 2009, Baker sent Erickson a new retainer letter to change the hourly fee arrangement for the *Ware* litigation, to a fixed monthly fee arrangement. The 2009 retainer letter contained the provisions titled "Waiver of Future Conflicts" and "Limitation of Client Relationship to One Entity, Not Affiliates," that were identical to the provisions Erickson had struck in the October 2007 retainer letter. Erickson struck the "Waiver of Future Conflicts" provision in the new retainer letter and Alston inserted a notice provision instead; however, she signed the revised retainer letter on or about September 1, 2009 *without* striking the "Limitation of Client Relationship" provision.

## II. Alston & Bird's Representation of the Consumer Choice Prepaid Card Coalition

In February 2009, Safeway hired Alston & Bird to represent it on energy, food safety and discreet healthcare matters. In spring 2009, legislation was introduced in the United States Senate that had particular significance to defendant's business. Following Safeway's referral, defendant began working with Kathryn Marks, an attorney at Alston, in connection with the pending legislation.

Several weeks after defendant began working with Alston, on April 14, 2009, Alston sent defendant a proposed engagement letter offering to assist defendant as its outside counsel on federal legislative matters affecting defendant's business. Defendant declined to sign the engagement letter Alston proposed. Instead, defendant coordinated the formation of the Consumer Choice Prepaid Card Coalition with defendant as leader of the Coalition and retained

4

Alston to represent the Coalition.  The purpose of the Coalition was to lobby Congress regarding a Gift and Credit "CARD" Act.

Defendant then engaged lawyers from Pillsbury Winthrop Shaw Pittman LLP to provide assistance to defendant regarding the same matters.  Pillsbury is a firm that represents both Safeway and defendant.  Pillsbury did not request and defendant did not sign a separate engagement agreement with Pillsbury for its performance of these additional services for defendant.

On May 8, 2009, the Coalition signed a formal retention agreement with Alston.  The retention agreement states that the "engagement [of Alston] will be based on a retainer basis, beginning on April 23, 2009 and ending October 23, 2009."  After Alston's retention, David Durant (defendant's general counsel), Gizelle Barany (Blackhawk's in-house attorney) and Talbott Roche (defendant's senior vice president of business development) had numerous communications with Alston to strategize about government affairs issues.  During April and May 2009, Alston attorneys had daily communications with defendant's personnel in connection with Alston's representation of the Coalition.

Often, only defendant's team was present for the meetings with Alston and "issues" were discussed that impacted defendant's businesses specifically.  When other members of the Coalition were not present, defendant's counsel spoke "openly" with Alston regarding defendants products, business operations, strategies, and future prospects.  As part of Alston's representation of the Coalition, Blackhawk provided Alston with information concerning defendant's business operations, strategies, and future prospects that it would not have shared with the other members of the Coalition.  Alston and the Coalition did not extend the May 2009 retention agreement beyond the October 23 end date stated in the agreement and did not perform any work on behalf of the Coalition after June 2009.  (The CARD act passed in May 2009.)

5

In November 2009, Robert Jones, an Alston partner, scheduled a business development and strategic planning trip to Safeway's offices in California. Jones did not request a meeting with Blackhawk since he was aware that at this time litigation had developed in which Alston represented plaintiffs and were adverse to defendant. However, during this trip, Jones met with defendant's personnel, including Donald Kingsborough (CEO), Talbott Roche, David Durant and Gizelle Barany. Safeway personnel also were present at this meeting. The meeting focused on how Alston would continue to assist defendant with a range of issues including the lobbying work Alston performed for defendant in connection with federal legislation; strategies to implement in connection with federal and state legislation; and defendant's present products and products in development. Aside from these broad topics, no additional details are available regarding exactly what was discussed at the November 2009 meeting. Among other things, this means that it is not clear whether the "lobbying work" discussed was related in any way to the lobbying work Alston performed for the Coalition. At the meeting, Jones did not discuss any of defendant's (or Safeway's) patents or intellectual property or the methods by which defendant's prepaid cards were processed or activated.

ANALYSIS

I. **Legal Standards**

Defendant contends that Alston should be disqualified because: (1) in the context of the *Ware* litigation, Alston agreed not to be adverse to defendant or made defendant its client in the context of preparing a 2007 retainer agreement with Safeway; and (2) defendant became Alston's client in connection with Alston's representation of the Consumer Choice Prepaid Card Coalition.

In deciding attorney disqualification motions, this court looks to the Wisconsin Supreme Court Rules of Professional Conduct for Attorneys. *See, e.g., Diettrich v. Northwest Airlines, Inc.*, 168 F.2d 961, 964 (7th Cir. 1999) (common practice for federal courts to apply state rules of

professional conduct); *Weber v. McDorman*, No. 00-C-0381-C, 2000 WL 34237498, at *1 (W.D. Wis. Aug. 11, 2000); *DCA Food Industries, Inc. v. Tasty Foods, Inc.*, 626 F. Supp. 54, 57 (W.D. Wis. 1985). The ethical codes adopted by the Wisconsin Supreme Court are based upon the American Bar Association's Model Rules. Wisconsin Supreme Court Order No. 04-07, Jan. 5, 2007 (available at http://www.legis.state.wi.us/statutes/04-07.pdf) (visited April 8, 2010). Accordingly, the standards applicable to disqualification motions brought under either set of rules are "essentially identical." *Callas v. Pappas*, 907 F. Supp. 1257, 1260 (E.D. Wis. 1995).

Motions to disqualify require the court to balance "the sacrosanct privacy of the attorney-client relationship (and the professional integrity implicated by that relationship) and the prerogative of a party to proceed with counsel of its choice." *Schiessle v. Stephens*, 717 F.2d 417, 420 (7th Cir. 1983). Although disqualification of counsel protects one attorney-client relationship, it destroys another by depriving a party of its prerogative to proceed with counsel of its choice. For this reason, the Court of Appeals for the Seventh Circuit has described disqualification as a "drastic measure which courts should hesitate to impose except when absolutely necessary." *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 721 (7th Cir. 1982). Motions to disqualify should be resolved with extreme caution because they may be used abusively as a litigation tactic. *Id.* at 722. Accordingly, "the moving [party] bears the heavy burden of proving facts required for disqualification." *Evans v. Artek Systems Corp.*, 715 F.2d 788, 794 (2d. Cir. 1983); *see also Commonwealth Ins. Co. v. Stone Container Corp.*, 178 F. Supp. 2d 938, 943 (N. D. Ill. 2001).

"The attorney client relationship is contractual and subject to the same analysis as other contract formation questions." *McCraw v. Mensch*, No. 06-C-86-S, 2006 U.S. Dist. LEXIS 85158, at *7 (W.D. Wis. Nov. 22, 2006) (citing *Security Bank v. Klicker*, 142 Wis. 2d 289, 295, 418 N.W.2d 27 (Ct. App. 1987)). The attorney-client relationship may be informal and implied from the words and actions of the parties. *Id.* at *7. Whether and when an attorney client relationship

exists depends on the contractual intent and conduct of the parties. *Id.* at *7-*8; *see also Westinghouse Elec. Corp. v. Kerr-McGee*, 580 F.2d 1311, 1317 (7th Cir. 1978) ("A professional relationship is not dependent upon the payment of fees nor, as we have noted, upon the execution of a formal contract.")

III. **Alston's Representation of Safeway Inc. in the *Ware* Litigation**

Defendant contends that, in the course of Alston's representation of Safeway, Alston agreed not be adverse to defendant and defendant became Alston's client. A lawyer representing a corporation may be barred from accepting representation adverse to an affiliate of that corporation in an unrelated matter if "the circumstances are such that the affiliate should also be considered a client of the lawyer [or] there is an understanding between the lawyer and the organizational client that the lawyer will avoid representation adverse to the client's affiliates." SCR 20:1.7 cmt. 34.

A. **Conflict by Agreement**

Defendant's first theory is that Alston agreed to treat defendant as a client for the purpose of determining conflicts of interest (agreed not to be adverse to defendant). It may be "one of the terms of the engagement that the corporate client expects some or all of its affiliates to be treated as clients *for purposes of Rule 1.7*–i.e., that the lawyer will not accept engagements that would be prohibited by that Rule if the affiliates were clients." ABA Comm. On Ethics and Prof'l Responsibility, Formal Op. 95-390 (1995) (emphasis in original). Although such an understanding between the lawyer and the corporate client "does not in itself establish a full fledged client-lawyer relationship with the affiliates," *id.*, nonetheless it creates grounds for disqualification.

A close look at the retainers between Alston and Safeway and the parties' dealings shows that defendant is incorrect. First, although defendant relies heavily on the 2007 retainer to establish the agreement, nowhere in the retainer does Alston explicitly agree not to be adverse to subsidiaries or to treat them as clients for the purpose of determining conflicts. Defendant focuses on the context of the retainer: the original draft included provisions explicitly waiving future conflicts and providing that the agreement did *not* make any subsidiaries a "client" of Alston's. As defendant points out, Safeway struck these provisions, stating its position that by representing Safeway, Alston was representing Safeway's subsidiaries and that Safeway would not agree to allow Alston to sue its subsidiaries. However, Safeway never put these statements into the amended retainer, so it is not clear whether Alston actually agreed with Safeway's position or simply agreed to delete the contrary language from the retainer agreement. Although the final retainer included Alston's proposed provisions with a strike-through line, this does not by itself establish their diametric, it just takes the parties back to ground zero.

Even if Safeway's unilateral pronouncements could be treated as an "understanding" that Alston would not be adverse to Safeway's subsidiaries, they relate to understanding in place in the 2007 retainer. That retainer was replaced with a 2009 retainer in which defendant agreed that Alston's representation of Safeway did not give rise to an attorney-client relationship between Alston and defendant's subsidiaries. In other words, any "understanding" was erased on September 1, 2009 by agreement. Because there is no evidence that Alston had started representing plaintiffs by that date, the 2007 agreement created no conflict.

Not so fast, argues defendant: Safeway should not be held to the terms of the 2009 agreement because it was not expecting the conflict terms to change from the previous agreement. This is not going to get defendant very far: a person signing a document has a duty to read it and know the contents of the writing. *Richards v. Richards*, 181 Wis.2nd 1007, 1017 (1994); *see also*

9

*Bayo v. Napolitano*, 593 F.3d 495, 502-03 (7th Cir. 2010)(observing in dicta that a party who agrees to terms in writing without understanding or investigating those terms does so at his own peril) (*en banc*).  Defendant's weak position is further undermined by the fact that Safeway's lawyer signed the contract, apparently without reading it first.

Defendant tries to shift the onus to Alston, by contending that the law firm was its "fiduciary" who therefore was required to alert Safeway to every change made to the agreement rather than expect Safeway to read it.  *See also* dkt. 39, at 10 (quoting *Westinghouse Electric Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311 (7th Cir. 1978), for the proposition that attorney must be "bound to the highest duty of fidelity, honor, fair dealing and full disclosure to a client" because "the attorney . . . is dealing in an area in which he is expert and the client is not and the client must necessarily rely on the attorney").  If Alston sneaked in a change (or just forgot to include Safeway's redactions in the new version of the agreement), that's either a sharp practice or sloppy work, but neither is enough to conclude that a large corporation with sophisticated in- house lawyers should not be held to the terms of an agreement it signed.

B.  **Conflict by Creation of Attorney-Client Relationship**

Next, defendant contends that its relationship with Alston's in the context of the *Ware* litigation evolved into a specific attorney-client relationship.  As a starting point,  Comment 34 to Wisconsin Supreme Court Rule 20:1.7 explains, "[a] lawyer who represents a corporation or other organization does not, by virtue of that representation, necessarily represent any constituent or affiliated organization, such as a parent or subsidiary."  SCR 20:1.7 cmt. 34.

Defendant's first attempt to establish a client relationship rehashes the "conflict by agreement" argument: Alston agreed to make defendant its client.  Thus, according to defendants, at most the 2009 agreement's erasure of the prior agreement not to be adverse merely made

10

defendant a "former client."  However, defendant takes the terms of the supposed agreement out of context.  To the extent Alston agreed to treat defendant as a "client," it was not for the sake of providing legal services to defendant (who was not a party to the agreement), but for the sake of avoiding conflicts important to Safeway.  An agreement to treat a subsidiary as a client in this setting "does not in itself establish a full fledged client-lawyer relationship with the affiliates," ABA Comm. On Ethics and Prof'l Responsibility, Formal Op. 95-390 (1995), so no current or former client status arises out of such an agreement.

The only other manner by which defendant could be considered a "client" of Alston's for the *Ware* litigation is if there existed some implied attorney-client relationship.  Such a relationship exists only if defendant had a "reasonable belief" that Alston was acting as its attorney in this context.  *Westinghouse*, 580 F.2d at 1312 (attorney-client relationship may be created if "lay party submits confidential information to the law party with the reasonable belief that the latter is acting as the former's attorney").  The only evidence of a relationship between defendant and Alston in the context of the *Ware* litigation is defendant's submission of confidential information related to its sales and business relationships.  However, the submissions occurred in the context of a motion to transfer the case.  In this context, it would not be reasonable for defendant to believe that Alston represented it.  The transfer motion was aimed at benefitting Safeway, which is a party in the case and is Alston's client by express agreement.  Moreover, defendant had its own reasons for handing over information that might be helpful to its parent company.

## III.  Alston's Representation of the Consumer Choice Prepaid Card Coalition

Defendant's final argument is that it became a client of Alston's in connection with Alston's representation of the Consumer Choice Prepaid Card Coalition.  A lawyer who represents a trade association does not have a conflict of interest with an individual member of the

association if the lawyer "neither has undertaken representation of the member nor otherwise stands in a lawyer-client relationship with that member." ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 92-365 (1992).

It is undisputed that Alston and the Coalition entered into an attorney-client relationship in spring 2009. The Coalition signed a retainer agreement on May 8, 2009 stating that the "engagement [of Alston] will be based on a retainer basis, beginning on April 23, 2009 and ending October 23, 2009." Defendant acknowledges that it was not a party to that agreement, instead arguing that Alston represented Blackhawk individually as a member of the Coalition based upon an implied attorney-client relationship. *Westinghouse*, 580 F.2d at 1320. A member of an association is not *necessarily* a client of the lawyer representing the association. Under *Westinghouse*, such an implied relationship is created only if the client believes "that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice." *Westinghouse*, 580 F.2d at 1319 (quoting McCormick on Evidence ($2^d$ ed. 1972), § 88, p. 179). The client's belief must be "minimally reasonable." *United States v. Keplinger*, 776 F.2d 678, 701 (7th Cir. 1985).

Defendant reasserts its previous arguments as reasons supporting its belief that Alston represented defendant in the Coalition context, including the 2007 retainer agreement in the *Ware* litigation and the confidential information provided in the *Ware* litigation related to the motion to transfer. However, if those arguments were insufficient to create a reasonable belief that defendant was a client of Alston in *that* context, they are that much less persuasive in the context of Alston's representation of the Coalition.

What defendant adds is that from spring 2009 until November 2009 it engaged in several communications with Alston pertaining to a wide range on subjects including Blackhawk's lobbying needs, business operations, present products and products in development and present and future business models. Fair enough; but as a member of the Coalition, Blackhawk should

12

have expected that it would be submitting *some* confidential information to the Coalition's counsel simply for the sake of furthering the goals of the Coalition.

More important, however, is the fact that defendant *refused* to engage Alston directly and instead created the Coalition, which became Alston's client.  Against this backdrop, it is hard to see how it would be reasonable for defendant to believe that it was consulting a lawyer and seeking professional legal advice from Alston individually.  It is even harder to see how such a belief would be reasonable in light of defendant's retention of Pillsbury.  According to defendant, their retention was simply to have "another set of eyes" reviewing Alston's work; however, while Alston was undeniably working for the Coalition as a whole, Pillsbury was *defendant's* "set of eyes" alone.  On these facts, it would be even "minimally reasonable" for defendant to believe that Alston somehow was representing defendant individually.  Although defendant asserts vaguely that it provided information that it would not have provided to other members of the Coalition, it has not provided any details or explained why it was reasonable for it to have done so in this situation.

Even if an attorney-client relationship had been created in such a context, defendant would have to be treated as a former client rather than a current one because Alston stopped working for the Coalition after June 2009.  The retainer stated that their relationship ended on October 23, 2009, but there is no evidence that any additional work was performed pertaining to the Coalition after June.  Likewise there is no evidence that defendant communicated with defendant after that date about matters related to the Coalition.  This is so even though defendant met with Alston in November 2009 to talk about subjects such as "lobbying work" related to "federal legislation," strategies for implementing legislation and present products and products in development.  Defendant does not explain whether these topics overlapped with Alston's work for the Coalition or involved new matters and fails to provide any details about the communications that would support such an inference.  Because defendant has the burden as the party urging disqualification,

the absence of more detailed information about the topics discussed in November 2009 cuts against defendant.  (Moreover, the CARD Act, which seemed to be the point of the Coalition's existence, was signed into law in May 2009, suggesting that the Coalition's work was done and its reason to exist was over. )

Thus, even supposing an attorney-client relationship did exist, disqualification would be warranted only if the subject matter of the present litigation were "substantially related" to the subject matter of Alston's previous representation with defendant.  SCR 20:1.9.  This segues into defendant's final argument, which is that, even if no direct relationship were established, Alston could be disqualified for its "derivative" relationship representing the Coalition, citing *Glueck v. Jonathan Logan, Inc.*, 563 F.2d 746, 749 (2[d] Cir. 1981) for the proposition that *any* time a lawyer represents an association, the lawyer should not be adverse to any members of the association on any matter "substantially related" to the lawyer's work with the association.

The problem with the "former client" and the *Glueck* theory is that the evidence does not support a conclusion that the Coalition's subject matter (gift card lobbying) is substantially related to the subject matter at issue in this case (patent-based challenge to defendant's gift card mall). True, both this lawsuit and the lobbying efforts relate in one way or another to "gift cards," which is defendant's business.  But there must be something more to the phrase "substantially related" than merely involving the client's business or its products in some general sense; otherwise, no lawyer could *ever* be adverse to a corporation that was a former client.

In Wisconsin, the term "substantially related" has been defined as requiring that the "factual context of the two representations [be] similar or related."  *Matter of Guardianship of Tamara L.P.*, 177 Wis.2d 770, 783, 503 N.W.2d 333 (Ct. App. 1993) (citations omitted); *Berg v. Marine Trust Co., N.A.*, 141 Wis.2d 878, 416 N.W.2d 643 (Ct. App. 1987) (citations omitted). In this case, the factual contexts are distinct; perhaps more accurately, defendant's efforts to relate

14

the two contexts fall short of suggesting even that they are similar.  Defendant has failed to show that the matters are substantially related and therefore that Alston should be disqualified on that ground.

In sum, although the court understands and is sensitive to defendant's legitimate concerns about facing Alston adversely in this lawsuit, nonetheless defendant's facts and arguments have not sufficiently established an agreement or attorney-client relationship of a sort that would justify the drastic remedy of disqualification.

## ORDER

It is ORDERED that:

1.   The motion by plaintiffs E2Interactive, Inc. and Interactive Communications International, Inc. to strike defendant Blackhawk Network, Inc.'s supplemental affidavits, dkt. 51, is DENIED with respect to evidence related to defendant's retention of Pillsbury and GRANTED in all other respects.

2.  Defendant Blackhawk Network, Inc.'s motion to disqualify Alston & Bird LLP, dkt. 14, is DENIED.

Entered this 16th day of May, 2010.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

15